IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BREGGETT A. RIDEAU, et al.       §
                                 §
VS.                              §   CIVIL ACTION NO. 4:10-CV-926-Y
                                 §
KELLER INDEPENDENT SCHOOL        §
DISTRICT, et al.                 §

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment (doc. 100) filed by defendant Keller Independent School District ("the District"). After review, the Court will grant the motion in part and deny it in part.

I.   Background

Plaintiffs are Breggett and Terrence Rideau, individually and as next friends of T.R., their seventeen-year-old son. T.R. suffers from acute encephalopathy, a condition of the brain that renders him unable to speak, walk, or feed himself, among other things. (Pls.' App. 18, 20.) T.R. wears a diaper, and requires considerable care and attention whenever he is awake. (*Id.*)

At all times relevant to this lawsuit, T.R. was a special-education student within the District--first, at Bear Creek Intermediate School ("Bear Creek") and, later, at Keller Middle School ("KMS"). His teacher during this time was Dan Evans. According to the Rideaus, Evans physically abused T.R. and several other disabled students in his special-education class on a number of occasions.

In support of their contention, the Rideaus offer the deposition testimony of Rebecca Bruton, a paraprofessional who worked in Evans's classroom at Bear Creek. Bruton testified at her deposition that Evans was frequently "impatient" and "force[ful]" with his students. (Pls.' App. 42, 44.) Bruton testified, for example, that Evans, when working with one particular student who had cerebral palsy, "instead of taking the time to stretch [the student] like he was supposed to, [Evans] would force the [student's] leg down" in a way that caused the student to "scream[] or stuff like that." (*Id.* at 44.) Bruton explained that Evans's actions so troubled her that she "wrote things down on a daily basis for a couple of weeks" and "turned in the notes that [she] had kept" to the principal.[1] (*Id.* at 49.) After the principal at Bear Creek met with Evans about the notes, testified Bruton, "he came in the classroom . . . laughing" and indicated that he had received "a slap on the wrist for unprofessionalism." (*Id.* at 49-50.)

T.R. and his classmates subsequently graduated from Bear Creek's intermediate life-skills class and enrolled in the life-skills program at KMS. Because their graduation caused the life-skills program at Bear Creek to dissolve, Evans applied for the KMS life-skills teacher position and was hired. (Pls.' App. 164.) The

---

[1]     Bruton's notes constitute unexcepted hearsay and, therefore, are inadmissible to prove the truth of their contents. But evidence that Bruton in fact took such notes and gave them to Bear Creek's principal is admissible to show that the District had notice of Evans's alleged actions at Bear Creek.

Rideaus contend that Evans's abuse of T.R. and his classmates continued at KMS.

To support this assertion, the Rideaus point to various harms that T.R. suffered while at KMS. During this time, T.R. began experiencing increased episodes of dystonia, a neurological condition characterized by sustained muscle contractions, which caused T.R. to assume abnormal postures and twisting movements. (Pls.' App. 22, 110, 209-10.) T.R. also sustained a number of injuries requiring him to leave school, including a large knot on his head, a broken thumb, and a dislocated knee. (*Id.* at 23, 111-12, 152-53, 215, 217.) The Rideaus also cite an incident during which Evans picked up T.R. in violation of the District's two-man lift policy, lost his balance, fell to his knees with T.R., and caused T.R. to hit his head and cry. (*Id.* at 87-88.)

Against this backrop, the Rideaus filed the instant lawsuit against the District; Dr. James R. Veitenheimer, Superintendent of the District; Cindy Lotten, the District's School-Board President; Sandra Chapa, Principal of KMS; and Evans. The Rideaus later dismissed the individual defendants from the lawsuit to avoid the delays inherent in qualified-immunity analysis. The District thereafter moved to dismiss a number of the Rideaus' claims, and the Court granted the motion in part and denied it in part.[2] The claims that remain pending against the District are the Rideaus' claims for violations of the Americans with Disabilities Act

---

[2]    The Court dismissed the Rideaus' claim for punitive damages and their claim under 42 U.S.C. § 1983 based on a state-created-danger theory.

("ADA") and Section 504 of the Rehabilitation Act of 1973 ("RA") and their claims under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment to the United States Constitution.[3]

## II. Legal Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule

---

[3]    As noted above, the Court has already dismissed the Rideaus' state-created-danger § 1983 claim. *Supra* note 2. Remaining in the case are their § 1983 claims based on special-relationship and official-custom-or-policy theories.

56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

III. Analysis

    A.    ADA and RA

"The ADA is a federal anti-discrimination statute designed 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabili-

ties.'"[4]  *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting *Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 261 (5th Cir. 1999)).  Similarly, "[t]he RA was enacted 'to ensure that handicapped individuals are not denied jobs or other benefits because of prejudiced attitudes or ignorance of others.'"[5]  *Id.* (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1259 (5th Cir. 1988)).  Because "the remedies, procedures and rights available under the RA are also accessible under the ADA, . . . jurisprudence interpreting either section is applicable to both." *Id.* (citations omitted) (internal quotation marks omitted).

To establish a claim for disability-discrimination under the ADA or RA, a plaintiff must show that (1) "he is a qualified individual"; (2) "he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity"; and (3) this "exclusion, denial of benefits, or discrimination is by reason of his disability."  *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004) (citing *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997)).  The plaintiff "may only

---

[4]  The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C.A. § 12132 (West 2013).

[5]  Section 504 of the RA states, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C.A. § 794(a) (West 2013).

recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574.[6]  When the plaintiff's claim is predicated on a school district's alleged failure to comply with the Individuals with Disabilities Education Act ("IDEA"), the plaintiff must demonstrate "facts creating an inference of professional bad faith or gross misjudgment." *D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 455 (5th Cir. 2010).

However, "neither a policymaker, nor an official policy must be identified for claims asserted under the ADA or the RA." *Delano-Pyle*, 302 F.3d at 575.  Congress, in enacting those statutes, "intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Id.*  Therefore, under the ADA and RA, a "public entity is liable for the vicarious acts of **any** of its employees." *Id.* at 574-75 (citing *Rosen v. Montgomery County Md.*, 121 F.3d 154, 157 (4th Cir. 1997); *Silk v. City of Chicago*, 194 F.3d 788, 806 (7th Cir. 1999); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001)); *see also Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009) ("The ADA imposes respondeat superior liability on the employer for the discriminatory acts of

---

[6]     The United States Court of Appeals for the Fifth Circuit has clarified that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the RA." *Delano-Pyle*, 302 F.3d 575. This is a different position than the one taken by several other federal intermediate appellate courts.  *See, e.g.*, *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012) ("We begin by noting that all but one [i.e., the Fifth Circuit] of our sister circuits to have addressed this issue have similarly concluded that a claim for compensatory damages under § 504 of the RA may be satisfied by a showing of deliberate indifference.") (citations omitted).

its employees."); *Pena v. Bexar Cnty., Tex.*, 726 F. Supp. 2d 675, 686 (W.D. Tex. 2010) ("[T]he Fifth Circuit held that the ADA, unlike section 1983, does not require a policy, custom, or practice of discrimination by a public entity, and instead contemplates respondeat *superior liability* for the public entity based on the actions of its employees and agents.").

Construing the summary-judgment record in the light most favorable to the Rideaus, the Court concludes that there are disputes of material fact that preclude summary judgment on the Rideaus' ADA and RA claims. First, it is undisputed that T.R. qualifies as "disabled" within the meaning of the ADA and RA. *Melton*, 391 F.3d at 671. Second, the Rideaus have produced circumstantial evidence that Evans intentionally mistreated T.R. in a manner that "denied [him the] benefits of [the] services, programs, [and] activities for which the [District] was responsible." *Id.*

For example, the Rideaus have presented evidence that, on at least three separate occasions, T.R. sustained injuries while under Evans's watch, including a large knot on his head, a broken thumb, and a dislocated knee. (Pls.' App. 23, 111-12, 152-53, 215, 217.) The Rideaus have also offered evidence of an incident during which Evans picked up T.R. in violation of the District's two-man lift policy, lost his balance, and fell to his knees with T.R., causing T.R. to hit his head and cry. (*Id.* at 87-88.) This evidence, reinforced by Bruton's deposition testimony that Evans was frequently "impatient" and "force[ful]" with T.R. and his class-

8

mates, is sufficient to create a dispute of material fact as to whether Evans intentionally discriminated against T.R. while acting as T.R.'s life-skills teacher. (*Id.* at 42, 44.)

Third, the Rideaus have produced evidence sufficient to support an inference that Evans's alleged discrimination was "by reason of [T.R.'s] disability." *Melton*, 391 F.3d at 671-72.   For example, Bruton testified in her deposition that Evans "often got more impatient with" T.R. and other "students who required a lot [of] attention," than he did with less needy students. (Pls.' App. 47-48.)   Further supporting an inference of discriminatory animus is Bruton's account of Evans's forceful treatment of the student with cerebral palsy, which often "caused the student to "scream[] or stuff like that."[7]   (*Id.* at 44.)   And because Evans was an employee of the District during this time, the District is vicariously liable for Evans's actions for purposes of the ADA and RA.   *See Delano-Pyle*, 302 F.3d at 574-75 (stating that under the ADA and RA, a "public entity is liable for the vicarious acts of **any** of its employees").

Moreover, even if the District were not vicariously liable for Evans's alleged actions, there is sufficient evidence on the record to create a dispute of material fact concerning whether the District acted with "professional bad faith or gross misjudgment" in carrying out its obligations under the IDEA.   *D.A. ex rel.*

---

[7] The District argues that evidence of Evans's conduct at Bear Creek is inadmissible character evidence under Federal Rule of Evidence 404(b).   The Court disagrees.   Evans's actions at Bear Creek are relevant to establish that he had the requisite intent and discriminatory animus to support a violation of the ADA and RA and also to show that the District exercised gross misjudgment in hiring him for the KMS life-skills position.

*Latasha A.*, 629 F.3d at 455.   Bruton testified that she "turned in the notes that [she] had kept" regarding Evans's behavior to the principal at Bear Creek.[8]   (Pls.' App. 49.)   Bruton further testified that Evans, after meeting with the principal, "came in the classroom . . . laughing" and indicated that he had received "a slap on the wrist for unprofessionalism." (*Id.* at 49-50.)   This evidence suggests that the District had notice of Evans's alleged misconduct when it nevertheless decided to hire him as the life-skills teacher at KMS.   In view of this, the Court concludes that there are disputes of material fact concerning whether the District exercised gross misjudgment in allowing Evans to remain T.R.'s life-skills teacher throughout the period in question. *See* 34 C.F.R. § 104.4(b)(4) (West 2013) (observing that section 504 of the RA precludes a school from administrating in a manner "(i) that ha[s] the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap" or "(ii) that ha[s] the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the [school]'s program or activity with respect to handicapped persons").

B.   Section 1983

Section 1983, unlike the ADA and RA, does not contemplate *respondeat superior* liability for public-entity employers.   *See Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010).   To the contrary, under § 1983, "the plaintiff must show that there was

---

[8]     As previously noted, the actual contents of the notes constitute inadmissible hearsay.  *See supra* note 1.

10

either an official policy or an unofficial custom, adopted by the municipality, that was the moving force behind the claimed constitutional violation." *Duvall v. Dallas Cnty.*, 631 F.3d 203, 209 (5th Cir. 2011) (citing *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694 (1978)). The Rideaus have not created a dispute of fact on this point.

As discussed above, the Rideaus have produced evidence sufficient to support a reasonable inference that the District exercised gross misjudgment in allowing Evans to remain a life-skills teacher in the District and in failing to effectively enforce their policies (e.g., the two-man lift policy). But there is no evidence in the record establishing that a policy or unofficial practice of the District was itself the moving force behind T.R.'s injuries. And because Evans's actions cannot be vicariously attributed to the District, as they can under the ADA and RA, there is no legal basis here for holding the District liable under § 1983.[9]

Furthermore, it appears that the Rideaus' special-relationship theory for holding the District liable under § 1983 is no longer a viable one in light of the Fifth Circuit's recent *en banc* decision in *Doe ex rel. Magee v. Covington County School District*, 675 F.3d

---

[9]   The Rideaus complain that the District did not place surveillance cameras in the life-skills classroom. But the Rideaus have not produced any evidence establishing that this failure to place cameras in the classroom was the moving force behind T.R.'s injuries. Moreover, given the numerous legitimate reasons for not installing cameras (e.g., costs or privacy concerns), the mere failure to do so does not support an inference of discriminatory animus.

849 (5th Cir. 2012).[10]  That case was brought on behalf of a nine-year-old student at a public elementary school who was sexually abused by an unauthorized person after that person was allowed to check her out of school.  *Doe ex rel. Magee*, 675 F.3d at 852-53.  The Fifth Circuit rejected the plaintiffs' contention "that compulsory school attendance laws, combined with [the student's] young age and the affirmative act of placing [her] into [the abuser's] custody . . . created a special relationship."  *Id.* at 858.  For these same reasons, this Court concludes that it must reject the Rideaus' contention that T.R.'s disability and his presence within the District created a special relationship.

The Rideaus distinguish *Doe ex rel. Magee* on the ground that the abuser in that case was a private third party, whereas the alleged abuser in this case, Evans, was an employee of the District.  The Rideaus also posit that T.R. is even more helpless than the young student in *Doe ex rel. Magee* because T.R. cannot speak up for himself or run away.  While these points are well taken, in the Court's view, they do not possess the requisite legal significance to take the instant case outside the precedential scope of *Doe ex rel. Magee*.

The Fifth Circuit reiterated in that decision that it has consistently declined to extend *DeShaney* liability beyond the circumstances of incarceration, involuntary institutionalization, and placement in foster care, and has "explicitly held that the

---

[10]  Earlier in this case, the Court allowed the Rideaus to proceed with their special-relationship claim.  But since that time, the Fifth Circuit has revisited the issue and issued its *en banc* decision in *Doe ex rel. Magee*.

state does not create a special relationship with children attending public schools." *Id.* at 856.  The Fifth Circuit also reiterated that absent a special relationship, "plaintiffs cannot state a constitutional claim based upon the defendants' alleged knowledge of dangerous circumstances." *Id.* at 863 (quoting *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994)). In view of this, the Court concludes that *Doe ex rel. Magee* is controlling and that, as a matter of law, the District did not assume a constitutional duty to protect T.R. from Evans's alleged misconduct.


IV.  Conclusion

Based on the foregoing, the Court concludes that the Rideaus have created disputes of material fact sufficient to avoid summary judgment on their ADA and RA claims, but that no disputes of material fact preclude summary judgment on their § 1983 claims.[11] Accordingly, the District's motion is GRANTED in part and DENIED in part.  The Rideaus' claims against the District under § 1983 are DISMISSED WITH PREJUDICE.

SIGNED March 5, 2013.


*Terry R. Means*
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[11]  The District, in its principal brief, argued that the Rideaus had failed to exhaust their administrative remedies in connection with their ADA and RA claims.  But the Rideaus responded by pointing to a prior settlement agreement between the parties in which the parties stipulated that the Rideaus had exhausted their administrative remedies.  (Pls.' App. 223.)  The District appears to concede this point, as it did not argue otherwise in its reply brief.