```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                       FORT WORTH DIVISION

PLAINSCAPITAL BANK            §
                              §
VS.                           §      Civil No. 4:10-CV-926-Y
                              §
KELLER INDEPENDENT SCHOOL     §
DISTRICT                      §
```

### MEMORANDUM OPINION AND ORDER GRANTING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND CONDITIONALLY GRANTING ALTERNATE MOTION FOR NEW TRIAL

In 2010, Breggett and Terrence Rideau, individually and on behalf of their disabled son, T.R., brought this action claiming that Keller Independent School District ("Keller") violated the Americans with Disabilities Act ("the ADA") and Section 504 of the Rehabilitation Act ("§ 504"). They allege that T.R.'s special education teacher, Dan Evans, intentionally mistreated T.R. because of his disability and that the mistreatment caused T.R. to experience increased episodes of dystonia[1] and sustain injuries at school.

In 2013, a jury found Keller liable and awarded the Rideaus $1,000,000.00 in compensatory damages.[2] On April 29, 2016, the Court entered an amended judgment on the jury verdict in favor of

---

[1] Pediatric neurologist, Dr. Gerald So, explained at trial that dystonia is an abnormal movement disorder that presents as an unusual posturing and stiffening of the body. (Vol. 4 Tr. of Jury Trial (ECF. No. 284) 147.)

[2] The jury awarded the following damages: $7,000 for T.R.'s past medical expenses; $320,000 for T.R.'s future home care; $520,000 for T.R.'s physical pain and mental anguish; $3,000 for T.R.'s past physical impairment; $100,000 for Breggett Rideau's mental anguish; and $50,000 for Terrence Rideau's mental anguish. (Verdict of the Jury (ECF No. 260) 8-9.)

PlainsCapital Bank ("PlainsCapital"), the guardian of T.R.'s estate.[3]

Before the Court are Keller's renewed motion for judgment as a matter of law and alternate motion for new trial. For the following reasons, the Court GRANTS Keller's renewed motion for judgment as a matter of law and CONDITIONALLY GRANTS Keller's motion for new trial (docs. 338, 341).

**I. Judgment as a Matter of Law--Liability**

In 1998, the United States Supreme Court, in *Gesber v. Lago Vista Indep. Sch. Dist.*, held that recovery of damages from a school district under Title IX for a teacher's discriminatory harassment[4] of a student requires proof that (1) a school-district employee with supervisory power over the offending teacher (2) had actual notice of the discrimination and (3) responded with deliberate indifference. See *Gesber v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 1999, 141 L.Ed.2d 277

---

[3] Because of the Rideaus' egregiously late production of documents to Keller the week before trial, the Court allowed the parties to conduct limited post-verdict discovery relating to who--the Rideaus or PlainsCapital (as the guardian of T.R.'s estate)--was the proper party to bring this suit on behalf of T.R. On January 7, 2015, the Court entered judgment dismissing the Rideaus' claims for lack of jurisdiction and denied PlainsCapital's motion to ratify the Rideaus' actions in prosecuting these claims on behalf of T.R. In its April 5, 2016 opinion, the United States Court of Appeals for the Fifth Circuit affirmed the Court's dismissal of the Rideaus' individual mental-anguish claims, vacated the Court's judgment in favor of Keller on all other claims, reversed its denial of PlainsCapital's motion to ratify, and remanded the case for further proceedings. See *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155 (5th Cir. 2016). In accordance with the Fifth Circuit's ruling, the Court entered an amended judgment on the jury verdict in favor of PlainsCapital. (Am. J. (ECF No. 331).)

[4] In *Gesber*, a female high school student who had been involved in a sexual relationship with one of her teachers sued Lago Vista Independent School District for sexual harassment under Title IX.

(1998); see also *King v. Conroe Indep. Sch. Dist.*, 289 F.App'x 1, 4 n.3 (5th Cir. 2007).

A year later, in *Davis v. Monroe Cty. Bd. of Educ.*, also a Title IX case, the Supreme Court held that school districts may also be liable for failing to address a student's sexual harassment of another student only where the district is deliberately indifferent to known acts of harassment. See *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

In 2014, the Fifth Circuit extended the deliberate-indifference standard to cases under § 504 and the ADA involving an allegation of a student's disability-based harassment of another student. See *Estate of Lance v. Lewisville ISD*, 743 F.3d 982, 996 (5th Cir. 2014). In doing so, the court explained that the Supreme Court's reasoning in *Davis* applies equally to harassment on the basis of personal characteristics enumerated in Title VI, Title IX, § 504, and other relevant federal anti-discrimination statutes.[5] See *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015)(citing *Lance*, 743 F.3d at 955).

Although the case before this Court is neither a Title IX case[6] nor one involving peer harassment, the Court finds

---

[5] Under § 504 of the Rehabilitation Act or the ADA, recovery of damages from a school district for a student's disability-based harassment of another student requires a plaintiff to prove that: (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, and (4) the defendant was deliberately indifferent to the harassment. See *Estate of Lance v. Lewisville ISD*, 743 F.3d at 996; see also *King v. Conroe Indep. Sch. Dist.*, 289 F.App'x 1, 4 n.3 (5th Cir. 2007).

[6] Although most discrimination claims brought against school districts in this circuit are typically framed as "harassment" or "abuse" of a student by either a peer or teacher, in this case, the jury was instructed to consider PlainsCapital's claims of a teacher's discriminatory "mistreatment" of T.R. However, because the underlying conduct about which PlainsCapital complains is discriminatory in nature and similar to harassment and/or abuse, the Court finds no reason why the jurisprudence interpreting deliberate indifference to these

instructive the *Lance* court's application of *Davis*--a Title IX case--to determine a school district's liability for disability-based harassment under § 504 and the ADA.

Here, Keller argues that it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50[7] because the jury did not have a legally sufficient evidentiary basis to find that Keller was deliberately indifferent. The Court agrees with Keller.

### A. Deliberate-Indifference Standard

In *Davis*, the Supreme Court explained that a school district should be deemed deliberately indifferent to acts of peer harassment only where its response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015)(quoting *Davis*, 526 U.S. at 648, 119 S.Ct.

---

forms of discriminatory conduct does not also apply to the discriminatory mistreatment alleged in this case.

7 Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Ellerbrook v. City of Lubbock, Tex.*, 465 F.App'x 324, 331 (5th Cir. 2012)(quoting Fed. R. Civ P. 50(a)). This standard is satisfied when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict." *Id*. (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003)).

In making this determination, "[t]he jury's verdict is afforded great deference." *Id*. (quoting *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005)). In reviewing all of the evidence in the record, [the court] must draw all reasonable inferences in favor of the nonmoving party, and [it] may not make credibility determinations or weigh the evidence. *Id*. (citations omitted). Thus, [the court] must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id*. (citation and internal quotation marks omitted). Further, [the court] gives credence to evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses. *Id*.

1661). As such, the deliberate-indifference inquiry does not "transform every school disciplinary decision into a jury question." *Lance*, 743 F.3d at 997 (quoting *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999)). Instead, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id*. (citing *Davis*, 526 U.S. at 649).

The deliberate-indifference standard is a high one. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not necessarily amount to deliberate indifference. *Id*. A school district's ineffective responses are not clearly unreasonable just because the actions continue. *See Sanches v. Carrolton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (citing *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 390 (5th Cir. 2000)). Schools are not required to accede to a parent's remedial demands, and courts should refrain from second-guessing the disciplinary decisions made by school administrators. *Id*. at 167 (citing *Davis*, 526 U.S. at 642, 648, 119 S.Ct. 1661).

**B. Case Analysis**

**1. Deliberate Indifference Found**

**a. *Doe v. Taylor Independent School District***

In *Doe v. Taylor Ind. Sch. Dist.*, high-school student Jane Doe, who had been sexually molested by her teacher, Jesse Stroud, sued Taylor Independent School District, its superintendent, Mike Caplinger, and her campus principal, Eddy Lankford, under 42 U.S.C.

§ 1983. See *Doe v. Taylor Ind. Sch. Dist.,* 15 F.3d 443 (5th Cir.)(en banc), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994). Doe's claims were based on the following facts.

> Jesse Stroud ("Stroud") was a biology teacher and assistant coach at Taylor High School from 1981-1987. During that time, it was no secret in the school community that Stroud behaved inappropriately toward female students.
>
> Eddy Lankford ("Lankford") became principal of Taylor High School in 1983. From 1983-1985, Lankford received various complaints about Stroud's behavior. Specifically, Lankford received parental complaints that Stroud favored certain female students and used inappropriate sexual innuendos in his biology lectures. He also received reports from the school librarian that Stroud was grabbing girls around the waist and hugging them excessively.
>
> During the 1984-1985 school year, Stroud began an inappropriate friendship with a freshman female student. Stroud placed gifts in her locker, walked her to class, and exchanged notes with her. In the fall of 1985, rumors about Stroud and the student, who was by then a sophomore, began circulating. In addition, Stroud had begun a similar inappropriate relationship with another female student. During the 1985 football season, Lankford approached Stroud outside the fieldhouse and spoke to him about being "too friendly" with the sophomore student.
>
> In May 1986, the school librarian reported to Lankford that she had seen Stroud in the library copy room catching female students as they jumped off of a table into his arms. The librarian described the behavior as akin to "child molestation."
>
> In July 1986, Mike Caplinger ("Caplinger") became the superintendent of Taylor Independent School District. Lankford did not inform Caplinger of any problems with Stroud or with his pattern of conduct. In August 1986, plaintiff Jane Doe entered Taylor High as a freshman. Stroud immediately befriended Doe, and the two began exchanging notes at school. Stroud gave Doe gifts, took her to lunch during the school day, and walked

her to class. In Stroud's biology class, Doe was not required to take tests or do class work.

In January 1987, Lankford heard that Stroud had taken Doe and other students to a rock concert and received multiple complaints about Stroud's favoritism toward Doe in the classroom. Lankford subsequently spoke with Stroud, and for the first time, notified Caplinger about possible problems with Stroud.

In February 1987, the assistant principal of Taylor's middle school reported to Caplinger that he had witnessed Stroud behaving inappropriately with several freshman girls, including Doe, at a basketball game. Caplinger instructed Principal Lankford to speak with Stroud about the incident, which he did. The athletic director also spoke to Stroud about the report.

On Valentine's Day, Stroud gave Doe a valentine that read, among other things, " I'm in love with you." A classmate of Doe's, Brittani B., found the valentine and took it to the guidance counselor. Brittani also shared her suspicions that the two were having a sexual relationship.

At the direction of the guidance counselor, Brittani took the valentine to Lankford the next day. After reviewing the note, Lankford told Brittani that there was no proof the valentine was from Stroud because it was not signed. Lankford did not keep a copy of the note and did not investigate the matter further. He did not tell Caplinger about the incident, nor did he speak with Stroud or Doe. Lankford's only action was to transfer Brittani out of Stroud's biology class. Doe and Stroud began having sexual intercourse on and off school grounds in April 1987.

In June 1987, two concerned parents reported to Caplinger that Stroud was behaving inappropriately with Doe and other female students at a local fair. In response, Caplinger contacted the parents of a girl who was reported to have been intoxicated and misbehaving with Stroud and Doe. When the girl's mother assured him that her daughter was not at the fair, Caplinger dismissed the report as unfounded without investigating further or contacting Doe's parents to discuss the report with them.

> In July 1987, Doe's parents discovered photographs of Stroud and handwritten notes from him in Doe's possessions. Doe's parents immediately contacted Caplinger. Caplinger privately met with Doe, who denied any sexual relationship with Stroud. At Caplinger's request, Lankford called Stroud, who denied any sexual involvement with Doe. For the first time, Lankford spoke of disciplinary consequences. Specifically, he suggested that Stroud resign or take an in-school suspension. Stroud refused.
>
> Caplinger, Lankford, and Stroud subsequently met to discuss the situation. Caplinger and Lankford warned Stroud to keep his distance from Doe, and that he would be fired "if something was going on." No further action was taken.
>
> On October 5, Doe's mother found more love letters from Stroud. On October 6, Stroud was suspended from employment. Stroud later resigned and plead guilty to criminal charges stemming from his molestation of Doe.

In determining whether Lankford and Caplinger were entitled to qualified immunity, the Fifth Circuit examined whether Doe had adduced summary judgment evidence that Lankford and Caplinger had acted with deliberate indifference. *Id*. at 457. The Court ultimately concluded that Principal Lankford could be found to have been deliberately indifferent based on evidence that he (1) received numerous reports of Stroud's inappropriate conduct with female students, including Doe, over the years, (2) regularly dismissed the various reports and parental complaints about Stroud's conduct, (3) never recorded any of the reported incidents in Stroud's personnel file, and (4) never discussed specific incidents with Doe, her parents, Stroud, or Caplinger. *Id*. at 457-58. The court explained that, "[a] jury could reasonably conclude that had Lankford taken actions that were obviously necessary in response to the valentine – indeed, if he had responded at all – the relationship might have been derailed at that point and the

violation of Jane Doe's rights would not have been as severe or prolonged." *Id*. at 457.

With respect to Caplinger, the Fifth Circuit noted that, when he received a complaint from a parent, he promptly notified Lankford and instructed him to speak with Stroud.  When Doe's parents complained to him, Caplinger responded by meeting with Doe, who denied any sexual relationship, and by verbally reprimanding Stroud. The Fifth Circuit found that, although Caplinger's response was ineffective, it did not exhibit deliberate indifference. *Id*.  In reaching its decision, the court explained:

> Deliberate indifference will often be a fact-laden question – as it is in this case – and, consequently, it is impossible for us to draw bright lines in such an inquiry.  We can forsee many good faith but ineffective responses that might satisfy a school official's obligations in these situations, e.g., warning the state actor, notifying the student's parents, or removing the student from a teacher's class.  Indeed, if Lankford had sternly warned Stroud early on to stay away from Doe or risk termination and Lankford then received no later indication of further misconduct, the standard of deliberate indifference would be difficult to establish. *Id*. at 457, n. 12.

The Court recognizes that the instant case is not a § 1983 case; however, the Fifth Circuit has since referred to the above-quoted language as the "*Doe v. Taylor* standard" against which it has measured evidence of a school district's deliberate indifference under Title IX.  See *King v. Conroe Indep. Sch. Dist.*, 289 F.App'x 1, 2 (5th Cir. 2007).  To the extent Keller's liability is based on the misconduct Dan Evans, the Court must determine, like the Court in *Doe v. Taylor*, whether a school official with supervisory authority over Evans responded to his misconduct with

deliberate indifference. As such, the Court concludes that the Fifth Circuit's analysis of a school official's response, even in the context of a § 1983 claim, is relevant to this Court's analysis in this case.

### b. *Vance v. Spencer Cnty. Pub. Sch. Dist.*

In *Lance*, the Fifth Circuit cites *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000) to illustrate circumstances of deliberate indifference. See *Lance*, 743 F.3d at 1000. In *Vance*, a female high school student sued Spencer County Board of Education ("Spencer") for gender discrimination under Title IX. Vance's claim was based on various incidents of peer sexual harassment that she endured while at school. A jury ultimately found that Spencer had violated Title IX.

In reviewing the district court's denial of Spencer's post-trial motion for judgment as a matter of law, the Sixth Circuit considered relevant to its analysis whether Spencer had knowledge that its initial response to alleged harassment was ineffective. *Vance*, 231 F.3d at 260-61.

> "Although no particular response is required to eradicate all [harassment], the school district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Id*.

The Sixth Circuit affirmed the district court's denial of Spencer's Rule 50 motion, holding that a jury could find deliberate indifference when:

> On one occasion, a student's harassing conduct culminated in stabbing Alma in the hand. With the exception of talking to the student, there was no evidence before the jury or this Court that Spencer took any action whatsoever. On another occasion, two male students held Alma while another took off her pants and others pulled her hair and attempted to rip off her clothes. With respect to that incident, the only evidence before the jury evincing Spencer's response is that a class room teacher spoke to the boys and Alma. There is no evidence before this Court that Spencer ever disciplined the offending students nor informed law enforcement as a result of any of these incidents. On yet another occasion, Alma's mother filed a detailed complaint with Spencer's Title IX coordinator. An investigation, however, never resulted. These three incidents alone reflect a deliberate indifference in light of the known circumstances. *Id*. at 265.

### 2. Deliberate Indifference Not Found

In *King v. Conroe Indep. Sch. Dist.*, 289 F.App'x 1, 2 (5th Cir. 2007), a Title IX coach-student sexual-abuse case, a parent reported to the principal, Don Stockton, that "she had overheard her son and his friend discussing an 'affair' between [volleyball coach Felicia Shupp] and a female student, in which the student and coach were seen kissing and passing notes." *King*, 289 F.App'x at 1. In response, Principal Stockton and the vice principal later met with Shupp and, after receiving a denial from her, warned Shupp to keep her relationships with students professional at all times. No further action was taken by Principal Stockton or other CISD officials. *Id*. The sexual relationship between King and Shupp ended three years later. *Id*.

The Fifth Circuit concluded that CISD was entitled to summary judgment because King could not establish that the principal, or any other CISD employee with supervisory authority over the offending coach, acted with deliberate indifference toward King's

statutory rights. *Id*. at 2.  The court explained that "Stockton met with Shupp, questioned her about the alleged relationship, and upon receiving a denial, warned her to keep her relationships with students professional at all times."  *Id*.  The Fifth Circuit concluded that, "[b]ased on the limited information [Stockton] had, such action satisfies the *Doe v. Taylor* standard."  *Id*.

### C. Application of Law to the Facts

In this case, the evidence reveals the following facts. During the 2007-2008 academic year, T.R. was a student in the life-skills class of Dan Evans at Keller's Bear Creek Intermediate School, where Tedna Taylor was the principal.  In the spring of 2008, Rebecca Bruton, who, at the time, worked as Evans's classroom aide, met with Principal Taylor to share her concerns about Evans's behavior toward students, including T.R.  In her April 4, 2008 notes, Bruton wrote that Evans used inappropriate humor in the classroom, ate T.R.'s snacks, was physically forceful and impatient with T.R., and improperly stretched students with excessive force. (Pl.'s Ex. 11.)  Bruton noted, among other things, that Evans "yanked [T.R.] about by the gait belt," "used his foot forcefully to move [T.R.]," and "yelled at [T.R.] in an aggressive manner." *Id*.

At trial, however, Bruton testified that she never told Principal Taylor that she considered Evans's actions to be abusive. (Vol. 3A Tr. of Jury Trial (ECF No. 270) 59.) Principal Taylor verified in her trial testimony that she did not perceive Bruton's complaints to be complaints about abuse. (Vol. 5 Tr. of Jury Trial (ECF No. 285) 87.)  Moreover, there is no evidence that Bruton or anyone else (including the Rideaus before they filed this lawsuit)

ever alleged or complained to anyone at Keller that Evans was mistreating T.R. because of his disability.[8]

On **April 17, 2008**, Principal Taylor and Heather Hughes, the Director of Special Education for Keller, met with Dan Evans to discuss Bruton's concerns. (Pl.'s Exs. 13.)  It is undisputed that Keller acquired actual knowledge of Evans's alleged mistreatment of T.R. at this meeting. [9]

On **April 25, 2008**, Principal Taylor e-mailed Evans a memorandum that memorialized their April 17 meeting. (Pl.'s Ex. 13.) Principal Taylor copied Penny Benz, assistant superintendent for human resources at Keller, on the e-mail. *Id*.  In her memorandum, Principal Taylor writes:

> Ms. Hughes and I reminded you that following the students' Individualized Education Programs and maintaining a working relationship with other staff members were expected. Ms. Hughes explained that when individuals work with the same students for multiple years, there is a tendency for teachers to assume more of a parenting role instead of maintaining the boundaries of the teacher-student relationship. Developing this type of informal relationship can lead to letting your guard down.  When that happens, you step out of the professional role.  Ms. Hughes encouraged you to maintain your behavior as if there were a camera that fed live video to parents continually throughout the day. *Id*.

Principal Taylor also directed Evans not to take any more food from students, follow occupational and physical therapy instructions, refrain from using any profanity, inappropriate

---

[8] Assuming *arguendo* that Bruton's notes provided Principal Taylor with notice of discriminatory mistreatment, PlainsCapital cannot establish that Keller acted with deliberate indifference to T.R.'s statutory rights.

[9] The Court instructed the jury that "Mr. and Ms. Rideau admit that Keller ISD acquired actual knowledge of such alleged mistreatment no sooner than April 17, 2008." (Jury Instr. and Jury Charge (ECF No. 259) 3.)

humor, or harsh comments, and "[w]hen you feel yourself losing your patience, ask an aide to step in so that you can take a moment to regain your composure." *Id.*

There is conflicting trial testimony about whether further action was taken by Keller after the April 17 meeting. Principal Taylor testified that she "purposely would touch base more often than normal," "would monitor more often down the hallway, just checking in the door to see if things were okay," and "talked with the other aide" to see how things were going. (Vol. 5 Tr. of Jury Trial (ECF No. 285) 90-91.) She ultimately concluded that there was no evidence of abuse in Evans's classroom. *Id.* at 89. According to Evans and Bruton, there was never any follow-up by Principal Taylor or anyone else at Keller (Vol. 3A Tr. of Jury Trial (ECF No. 270) 13-19, 91.)

Nonetheless, toward the end of the school year, on **May 1, 2008**, Debbie Lamar, then the acting principal of Keller Middle School ("KMS"), requested that Evans be transferred to KMS, where, as it happened, Evans would again serve as T.R.'s life-skills teacher beginning in August 2008. Shortly thereafter, Sandra Chapa became the principal of KMS. Principal Chapa testified at trial that "[Evans] was already signed on at Keller Middle School before I was hired," and "[t]he previous principal is the one who signed the personnel action form for [Evans]." (Vol. 4 Tr. of Jury Trial (ECF No. 284) 191.)

Over one year later, on **May 29, 2009**, while T.R. was a student in Evans's classroom at KMS, T.R. sustained an injury to his left knee. (Def.'s Ex. 94.) Ms. Rideau testified at trial that she believed T.R. sustained the injury while he was at school on May 26, though there was no corroborating evidence supporting her belief.

In the fall of 2009, Ms. Rideau notified Principal Chapa that the frequency of T.R.'s dystonia episodes were increasing and that she believed they were tied to T.R.'s diaper changes. At some point, Ms. Rideau made a comment that sexual abuse could potentially cause an increase in dystonia episodes, but it is undisputed that she never made an allegation that anybody at Keller was sexually abusing T.R.  Nonetheless, in response, Principal Chapa reported the comment to her supervisors and Keller's general counsel and reviewed Keller's professional conduct policies with Evans to ensure that proper classroom procedures were being followed, including ensuring that two people were always present during diaper changes. (Vol. 4 Tr. of Jury Trial (ECF No. 284) 194-95; Vol. 5 Tr. of Jury Trial (ECF No. 285) 54-55.) Keller also continued to maintain a log tracking the date and length of and the circumstances surrounding T.R.'s dystonia episodes. Principal Chapa found no evidence of any sexual abuse of T.R.  (Vol. 5 Tr. of Jury Trial (ECF No. 285) 55.)

On **October 6, 2009**, T.R.'s teachers called the KMS school nurse, Susan Smith, because they were concerned about a lump on the left side of T.R.'s forehead.  Nurse Smith notified Ms. Rideau about the lump, and Ms. Rideau subsequently took T.R. to Cook Children's Urgent Care Center for the listed chief complaint of "[b]ite to L eye brow." (Def.'s Exs. 109 (DEF2028); 95.) Although the cause of the lump is disputed, the medical records indicate that T.R. was diagnosed with "insect bite." *Id*.  Mrs. Rideau testified that "[i]t looked like [T.R.] had been hurt, kicked, dropped – I promise you," and "[i]t looks like he hit his head on something."  (Vol. 2 Tr. of Jury Trial (ECF NO. 282) 69.)

Just over two months later, on **December 10, 2009**, Ms. Rideau took T.R. to Cook Children's Northeast Hospital for an injury to

his left thumb (Pl.'s Ex. 140.) The next day, Principal Chapa began an investigation during which she "spoke to both the paraprofessionals, to the teacher, OT/PT, occupational therapist, physical therapist, the nurse, [and] anybody that had been in the classroom, to see if they were aware of any concerns or anything that had gone on in the classroom ..." (Vol. 5 Tr. of Jury Trial (ECF No. 285) 57-58.) She concluded that nobody knew of anything that would have caused T.R. to injure his thumb at school. *Id*.

On **April 1, 2010**, Evans called Ms. Rideau because T.R. was in distress. In his April 1 notes, Evans describes that T.R. was "upset," "grabbing his mouth," and shaking his legs. (Pl.'s Ex. 21.) Upon her arrival at KMS, Ms. Rideau asked Evans to call 911. *Id*. T.R. was subsequently transported by ambulance to Baylor Medical Center at Grapevine where he was admitted for constipation and "possible seizure." (Def.'s Ex. 101.) On **April 9, 2010**, T.R. was seen at Cook Children's Medical Center for an injury to his right knee. Ms. Rideau testified that she believed T.R. dislocated his knee at school on April 1. (Def.'s Ex. 69.) Evans was placed on administrative leave that same day, and Principal Chapa began another investigation,[10] which led to T.R.'s being transferred to Indian Springs Middle School and Evans's May 7, 2010 resignation from Keller. (Pl.'s Exs. 101-A, 101-B, 24, 25.) Principal Chapa also recommended that Theresa Crowe, who was Evans's classroom aide at the time, be transferred to another campus. On May 7, 2010, James Veitenheimer, Superintendent of Schools, reported Ms.

---

[10] During her 2010 investigation, Principal Chapa learned that Evans had not always been following Keller's unofficial policy to use the "two-man lift" when transitioning students and that Evans had once lost his balance and dropped T.R. on his head when transferring him out of his wheelchair.

Page **16** of **20**

Rideau's allegations of Evans's misconduct to the Texas Education Agency. (Pl.'s Ex. 101-A.)

It is undisputed that Principal Chapa had no knowledge of any concerns or complaints about Evans's behavior until, at the very earliest, **December 10, 2009**, when she learned that T.R. had injured his thumb.[11] (Pl.'s Br. in Opp'n to Keller's Mot. for J. (ECF No. 348) 18.) At trial, Principal Chapa testified she never knew about Evans's alleged mistreatment of T.R. at the Bear Creek campus until she began her 2010 investigation. According to the trial testimony of Principal Chapa and Principal Taylor, Principal Taylor did not believe that she needed to tell Principal Chapa about Evans's performance prior to that time because Principal Taylor believed that she had adequately dealt with and addressed the situation.

Even when viewed in the light most favorable to PlainsCapital, the evidence shows that Keller's response exceeded that in *Doe v. Taylor* and *Vance v. Spencer County*, where deliberate indifference was found, and in *King v. Conroe ISD*, where deliberate indifference was not found.

In sharp contrast to Principal Lankford's response in *Doe v. Taylor*, after Principal Taylor first received notice of Bruton's concerns about Evans's behavior in April 2008, she met with Evans and Director Hughes to address those concerns on April 17. At the meeting, Principal Taylor and Director Hughes explained their professional expectations of Evans and directed that he refrain from certain conduct and maintain certain classroom behavior. Although her response is similar to Principal Stockton's response in *King v. Conroe ISD*, Principal Taylor's response was more diligent. Not only did Principal Taylor include her supervisor in

---

[11] Chapa testified that she did not know about T.R.'s May 26, 2009 left knee injury or October 6, 2009 swollen left eyebrow until the Spring of 2010 when she began her investigation into the April 1, 2010 episode.

the April 17 meeting with Evans, but eight days afterward, she prepared and e-mailed Evans and Asst. Superintendent Benz a thorough memorandum detailing what was discussed at the meeting, reinforcing upon Evans the school district's expectations of him.

In contrast to *Vance v. Spencer County*, for 20 months, Keller was unaware that its initial April 17, 2008 response to incidents involving T.R. at Bear Creek might have been ineffective. From **April 17, 2008, until December 10, 2010**, Keller did not receive any allegations or otherwise have actual knowledge or notice that Evans was mistreating T.R. Moreover, when Principal Chapa learned of T.R.'s December 10, 2010 thumb injury, Keller's response heightened. Principal Chapa conducted an immediate and exhaustive investigation that was inconclusive as to what caused T.R.'s thumb injury. After the April 1, 2010 incident, Keller once again modified its response by taking more aggressive measures that ultimately removed T.R. from Evans's classroom and forced Evans's resignation from the district.

PlainsCapital argues that Keller should have done more and should not have allowed Evans to transfer to and continue to teach T.R. at KMS. While there is evidence that Keller perhaps could have responded differently or more aggressively, the test for this Court to apply is not whether Keller did all it could or should have done, but whether it acted with deliberate indifference to T.R.'s legal rights. *See King*, 289 F.App'x at 2. Although Keller's initial remedial actions, in hindsight, may have been inept, such ineptitude does not amount to deliberate indifference. See *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

For the foregoing reasons, the Court concludes that, under the binding caselaw of this circuit, which is deferential to school

.


districts, the jury did not have a legally sufficient evidentiary basis to conclude that Keller's response was clearly unreasonable or that Keller, by its own actions, intentionally discriminated against T.R. Keller's motion for judgment as a matter of law on liability and damages[12] is therefore GRANTED.

## II. Motion for New Trial

Under Rule 50(c), the Court must conditionally rule on Keller's alternate motion for new trial, which may be granted if the first trial was unfair or if the jury verdict was against the great weight of the evidence. *See* Fed. R. Civ. P. 50(c)(1); *see also Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005)(citing *Scott v. Monsanto Co.*, 868 F.3d 786, 789 (5th Cir. 1989)).

Because the Court has concluded that there is not a legally sufficient evidentiary basis to support the jury's liability finding against Keller, for the same reasons, the Court also concludes that the jury's liability finding is against the great

---

[12] Assuming *arguendo* that there is legally sufficient evidence to support the jury's liability finding against Keller, the Court concludes that Keller's renewed motion for judgment as a matter of law with respect to the amount of damages awarded by the jury should be denied. The testimony of various witnesses who describe T.R. experiencing pain, photographs of T.R.'s injuries, and medical records that substantiate T.R.'s physical injuries and make note of T.R.'s pain provide a legally sufficient evidentiary basis to support the jury's $520,000 physical pain and mental anguish damage award to T.R. See *Cowart v. Erin*, No. 15-10404, 837 F.3d 444, 2016 WL 4784010 (5th Cir. Sept. 13, 2016)(internal quotations mark omitted)(When a jury's damage award includes recovery for pain and suffering, which are to a large degree, not susceptible to monetary quantification, the jury has especially broad leeway)).

Keller's argument that there is legally insufficient evidence to support the jury's remaining damage awards because they are based on the erroneously admitted and speculative expert testimony of Susan Brooks is foreclosed by *Texas Commercial Business Systems, Inc. v. Federal Communications Corp.*, 898 F.2d 460, 461 (5th Cir. 1990)(A district court may not grant a judgment notwithstanding the verdict by disregarding evidence admitted at trial on the ground that the court erred by admitting the evidence). See also *Dixon v. Int'l Harvester Co.*, 754 F.2d 573 (5th Cir. 1985).

weight of the evidence. See *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982)(citation omitted)(The great-weight-of-the-evidence standard is lower than that for a judgment notwithstanding the verdict)). In addition, for the reasons stated in Keller's motion for new trial concerning the Rideaus' discovery abuse, the Court concludes that the trial of this case with respect to damages was ultimately unfair. For these reasons, the Court CONDITIONALLY GRANTS Keller's motion for new trial.

Furthermore, although not raised by Keller, based on the Court's preliminary independent research, it appears that the amount of compensatory damages awarded by the jury in this case may be subject to a statutory damage cap. See *Lance*, 743 F.3d at 996, n. 9 (citing 29 U.S.C. § 794a(a)(2) and 42 U.S.C. § 12133). See also *Giles v. General Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001); *Solomon v. Godwin and Carlton, P.C.,* 898 F.Supp. 415, 416-17 (N.D. Tex. 1995)(Fitzwater, J.).

### III. Conclusion

For the foregoing reasons, Keller's renewed motion for judgment as a matter of law is GRANTED, and Keller's alternate motion for new trial is CONDITIONALLY GRANTED.

SIGNED November 29, 2016.

                                              */s/ Terry R. Means*
                                              TERRY R. MEANS
                                              UNITED STATES DISTRICT JUDGE